UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-22997-Civ-UNGARO-BENAGES
       (06-20442-Cr-UNGARO-BENAGES)
MAGISTRATE JUDGE P. A. WHITE

DWIGHT MOSS,                    :

        Movant,                 :

v.                              :        **REPORT OF MAGISTRATE JUDGE**
                                         **FOLLOWING EVIDENTIARY HEARING**
UNITED STATES OF AMERICA        :

        Respondent.             :

_____

Introduction

        This matter is before this Court on the movant's motion to vacate, attacking his convictions and sentences for trafficking and using one or more unauthorized access devices, effecting transactions with access devices issued to another person, three counts of aggravated identity theft, and felon in possession of a firearm, entered following a jury verdict in case no. 06-20442-Cr-Ungaro-Benages.

        This Court has reviewed the motion (Cv-DE#1) with supporting memorandum (Cv-DE#2), supplemental argument (Cv-DE#6), and supplemental memoranda (Cv-DE#s21,38,40), the government's responses with multiple exhibits (Cv-DE#s9,24,34,43), the movant's replies (Cv-DE#s10,24), the PSI, and the underlying criminal file.

        The movant is proceeding in this collateral proceeding on the following claims:[1]

_____

[1]In compliance with this court's order, counsel has recently filed a comprehensive memorandum identifying the claims the movant is proceeding on in this collateral proceeding. See Cv-DE#40. As previously noted in this proceeding, the movant has attempted to raise additional claims pro se while being represented by counsel. The movant's requests have been stricken as he was

1.    He was denied effective assistance of counsel, where his lawyer failed to adequately consult with the movant regarding pleading straight up to the indictment or negotiating a plea agreement. (Cv-DE#10:78; Cv-DE#40).

2.    He was denied effective assistance of counsel, where his lawyer failed to challenge on appeal the trial court's denial of the justification and/or innocent possession instruction. (Cv-DE#10:9-15,65; Cv-DE#9:33,39; Cv-DE#40).

3.    He was denied effective assistance of counsel, where his lawyer failed argue at the suppression proceeding that: (1) the movant was seized in violation of <u>Miranda</u>,[2] (2) the consent was not knowing and voluntary because it was based on an unlawful detention; and, (3) the search and seizure was effectuated by Florida state police officers, who exercised power beyond their jurisdiction. (Cv-DE#21).

After review of the record, it became apparent that an evidentiary hearing was necessary at least with regard to claim one, as listed above. Nathan Clark, Esquire was appointed to represent the movant, and evidentiary hearings were held on December 3, 2009 and February 23, 2010.

<u>Factual and Procedural History</u>

In order to place the procedural posture of this case in context, a detailed procedural history of the underlying criminal case is required.

----

cautioned that he was not entitled to hybrid presentation, proceeding *pro se* and through counsel. Therefore, the only claims that will be considered by this court are those which have been presented by counsel in his most recent memorandum. <u>See</u> Cv-DE#40.

   [2]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

On July 21, 2006, an Indictment was returned charging the movant with trafficking and using one or more unauthorized access devices, in violation of 18 U.S.C. §1029(a)(2) (Count 1), effecting transactions with access devices issued to another person, in violation of 18 U.S.C. §1029(a)(5) (Count 2), three counts of aggravated identity theft, in violation of 18 U.S.C. §§1028A(a)(1) (Counts 3-5), and felon in possession of a firearm, in violation of 18 U.S.C. §922(g)(1). (Cr-DE#1).

Prior to trial, the movant filed a pretrial motion to suppress the recorded statement he provided at the Pembroke Pines Police Station on February 28, 2006, and the information obtained in an initial search of his residence, on the basis that he was unlawfully detained. (Cr-DE#21). The movant also moved to suppress the fruits of a search warrant executed at his home on March 21, 2006, pursuant to Franks v. Delaware, 438 U.S. 154 (1978), on the basis that the affidavit in support thereof was inaccurate. (Id.). Following an evidentiary hearing, a Report was entered recommending that the motion be denied. (Cr-DE#30). Thereafter, an order was entered adopting the Report and denying the suppression motion. (Cr-DE#39).

The movant then proceeded to trial where he was found guilty as charged following a jury verdict. (Cr-DE#51). The movant's motion for new trial and for judgment of acquittal (Cr-DE#95:342-45; Cr-DE#s59,80) were denied by the district court. (Cr-DE#95:342-45; Cr-DE#s60,82).

Prior to sentencing, a PSI was prepared which revealed as follows. The PSI grouped the movant's convictions, resulting in a combined adjusted offense level 26. (PSI ¶¶43-48). In so doing, the PSI noted that Counts 1 and 2 are grouped together because the

offense level is determined based on the total amount of harm or loss pursuant to U.S.S.G. §3D1.2(d).[3] (PSI ¶26). Counts 3 and 5 were excluded from the grouping rules pursuant to U.S.S.G. §3D1.1(b)(2). (PSI ¶27). Count 6 constitutes a separate harm and cannot be grouped, therefore, pursuant to U.S.S.G. §3D1.1(a)(3), the offense level applicable to all groups taken together shall be determined by applying the rules set forth in U.S.S.G. §3D1.4.[4] (PSI ¶28).

The combined offense levels were then computed by taking the offense level applicable to the group with the highest adjusted level and increasing the adjusted level by the appropriate number of levels, in accordance with the units assigned, as reflected in the table provided in U.S.S.G. §3D1.4. (PSI ¶29). Thus, the recommended total offense level was 26. (PSI ¶51). The PSI next determined that the movant had a total of 16 criminal history points, resulting in a criminal history category VI. (PSI ¶¶63-65).

Based on a total offense level of 26 and a criminal history category of VI, the PSI recommended a guideline range of 120 to 150 months for Counts One, Two and Six (PSI ¶117). As to Count 3, it

---

[3]The base offense level applicable to the grouped offenses of Counts One and Two was 6, pursuant to U.S.S.G. § 2B1.1(a)(2), which is the guideline applicable to violations of 18 U.S.C.§§1029(a)(2) and 1029(a)(5). (PSI ¶30). A fourteen-level increase pursuant to U.S.S.G. §2B1.1(b)(1)(h) because the loss resulting from the movant's credit card fraud was more than $400,000 but less than $1,000,000.00. (PSI ¶31). An additional two-level increase, pursuant to U.S.S.G. §2B1.1(b)(1)(B), was added because the offense involved trafficking of unauthorized devices. (PSI ¶32). Two more levels were added pursuant to U.S.S.G. §3B1.1(c), based on the movant's role as a leader or organizer in the offenses. (PSI ¶34). Thus, as to Counts One and Two, the recommended adjusted offense level for those grouped offenses ("Group One") was set at a level 24. (PSI ¶36).

[4]The base offense level applicable to the firearm charge in Count 6 was 24, pursuant to U.S.S.G. §2K2.1(a)(2), which is the guideline applicable to violations of 18 U.S.C. §922(g)(1). (PSI ¶37). The PSI did not recommend any sentencing enhancements (PSI ¶¶38-41). Thus, the adjusted offense level for Count Six ("Group Two") was 24 (PSI ¶42).

recommended a total term of 2 years in prison, to run consecutive to any other term of imprisonment pursuant to U.S.S.G. §2B1.6 comment n.1(A). As to Counts Four and Five, the mandatory term of imprisonment is 2 years, which shall run consecutive to any other term of imprisonment, except that said terms may run concurrently, in whole or in part, at the court's discretion, to any additional violation of 18 U.S.C. §1028A, 18 U.S.C. §1028A(a)(1) and (b)(2), (4). (PSI 117).

The movant filed several objections to the PSI (Cr-DE#81). First, the movant objected to application of a two-level role enhancement (Id.:¶6). The movant also objected to paragraph 65 of the PSI, which assigned the movant a criminal history category of VI. (Cr-DE#81:¶5). Finally, the movant objected to paragraph 31 of the PSI, which recommended a fourteen-level increase under U.S.S.G. §2B1.1(b)(1)(D), based on the Probation Office's conclusion that the case involved a loss of $493,878.84. (Cr-DE#81:¶7).

Pursuant to bank records and spreadsheets, the loss for fraudulent purchases made on accounts listing the movant as an authorized user was $255,445.61 (Cr-DE#97:8-10). The court used this amount to calculate the movant's sentence under the guidelines and to establish the amount of restitution involved (Id.).

After "consider[ing] the statements of the parties, the presentence report containing the advisory guidelines and the statutory factors," the district court imposed a sentence at the high end of the advisory guidelines. (Cr-DE#97:17-18). Specifically, the court imposed a sentence of 150 months in prison as to Counts One, Two and Six, following by a consecutive 72 months in prison as to Counts Three, Four and Five, for a total of 222 months in prison. (Id.:18-21). The court also ordered restitution

in the amount of $255,445.61, three years supervised release, and special assessments totaling $600.00. (Id.).

The movant appealed, raising the following claims:[5]

1. The court erred in denying the movant's motion for judgment of acquittal where the government failed to prove a *prima facie* case as to all counts.

2. The court erred in denying the movant's motion to suppress where there was insufficient evidence regarding the consent to search, the waiver of the movant's constitutional rights, and the denial of a *Franks* hearing.

3. The court erred in its admission into evidence of a bullet proof vest discovered during a search of the movant's residence.

4. The court erred at sentencing in imposing a high end advisory guideline sentence, where the indictment did not charge a specific amount of fraud and the jury did not determine the amount.

On April 14, 2008, the Eleventh Circuit, in a written, but unpublished opinion, affirmed the movant's convictions and sentences. United States v. Moss, 273 Fed.Appx. 840 (11th Cir. 2008); (Cr-DE#125). The judgment of conviction in the underlying criminal case became final, for purposes of the federal one year limitations period under the AEDPA, at the latest on July 14, 2008, when time expired for seeking certiorari review ninety days following the conclusion of the movant's direct appeal.[6] His motion

---

[5]The claims are gleaned from the movant's initial brief on appeal, located on Westlaw, a legal research database, at United States v. Moss, 2007 WL 2329412 (11th Cir. 2007), and from the Eleventh's Circuit written, but unpublished opinion affirming the movant's convictions and sentences, United States v. Moss, 273 Fed.Appx. 840 (11th Cir. 2008); (Cr-DE#125).

[6]The Supreme Court has stated that a conviction is final when a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied. Griffith v. Kentucky, 479 U.S. 314, 321, n.6 (1986); accord, United States v. Kaufmann, 282 F.3d 1336 (11th Cir. 2002). Once a judgment is entered

6

was due to be filed in this court within one year, or no later than July 14, 2009. <u>See</u>  <u>Griffith v. Kentucky</u>, 479 U.S. 314, 321, n.6 (1986); <u>accord</u>, <u>United States v. Kaufmann</u>, 282 F.3d 1336 (11th Cir. 2002). This motion to vacate was timely filed less than one year later on October 24, 2008.[7] (Cv-DE#1).

Facts Adduced at Trial

The evidence adduced at trial reveals that the movant fraudulently used the credit accounts and personal information of others to make unauthorized purchases at retail stores throughout South Florida. Specifically, Agent Redding, the Task Force case agent for the investigation (Cr-DE#95:315), explained that the movant used two forms of fraud, "fraudulent applications" and "account takeovers." (Cr-DE#95:317-18). A fraudulent application occurs when an account is opened by an individual using someone else's personal information without that person's knowledge. (Cr-DE #95:316-17). Fraudulent applications can be completed over the phone or on the internet (<u>Id</u>.) In an account takeover, the credit account involved is opened legitimately by the true account holder using his or her own personal information (Cr-DE#95:317-18). Someone else then accesses the account and uses the true account holder's personal information to add himself as a secondary authorized user (<u>Id</u>.). With both forms of fraud, an unauthorized individual is using the personal information of another to access

---

by a United States court of appeals, a petition for writ of certiorari must be filed within 90 days of the date of entry. The 90 day time period runs from the date of entry of the judgment rather than the issuance of a mandate. <u>Sup.Ct.R</u>. 13; <u>see</u> <u>also</u>, <u>Close v. United States</u>, 336 F.3d 1283 (11th Cir. 2003).

[7]<u>See</u>: <u>Adams v. U.S.</u>, 173 F.3d 1339 (11 Cir. 1999) (prisoner's pleading is deemed filed when executed and delivered to prison authorities for mailing). Although not dated, it was received by the Clerk on September 30, 2008, therefore, that will be the date used for calculating the timeliness of the instant case.

that person's credit without that person's knowledge. In a fraudulent application, however, the person committing the fraud is opening a new account while, in an account takeover, the perpetrator is "taking over" a preexisting account. The government presented evidence showing that the movant fraudulently opened and/or "took over" numerous credit accounts.

Michael Scott, a field investigator for Citibank ("Investigator Scott"), testified that Citibank handles the corporate credit accounts for many of the stores where the movant made purchases. (Cr-DE#94:130-31). Investigator Scott showed the jury bank records and store receipts proving that the movant listed himself as an authorized user on numerous accounts and that he routinely made sizable purchases on these accounts. (Cr-DE#94:130-52).

First, bank records and store receipts showed that the movant opened and used a Home Depot credit account in the name of Lewis Beauperthuy. (Cr-DE#94:133-37). The account was opened over the phone on April 26, 2005 using Beauperthuy's name and social security number. (Id.). The following day, the movant added himself as an authorized user. (Id.). The last four digits of the Beauperthuy account were 6755. (Id.). On April 27, 2005, the movant made several large purchases using the Beauperthuy account (GX 2B.). He made two transactions at the Palm Beach Home Depot totaling $1,867.51 and $500. (Id.). He then went to Home Depot in Deerfield Beach and made three purchases for $1,646.94, $438.06, and $528.93. (Id.). The store receipts showed that the purchases were made on an account number ending in 6755. (Id.). They also showed that the person making the purchases presented a driver's license, ending in 2950, to establish his identity as an authorized user on the account. (Id.).

Second, bank records and store receipts demonstrated that the movant opened and used a Home Depot credit account in the name of Michael Nurse. (Cr-DE#94:138-40). The account was opened on the internet on July 12,2005 using Michael Nurse's personal information. (Id.). The movant also listed himself on the account as an authorized user. (Id.). The last four digits of the Michael Nurse account were 4712. (Id.). On July 13,2005, the movant made several purchases at the Home Depot in Boynton Beach, Florida using the Michael Nurse account, buying a riding lawn mower, grass trimmer, and blower for $2,166.57. (Id.). He then purchased two $400 gift cards at the same store. (Id.). Both receipts established that the purchases were made on account number 4712. (Id.). They also indicated that the purchaser presented a driver's license ending in 2950. (Id.).

Third, bank records and store receipts showed that the movant also opened and used a Home Depot account in the name of Michael Nurse's wife, Cyrilla Nurse. (Cr-DE#94:140-42). The last four digits of the Cyrilla Nurse account were 5065. (Id.). Like the Michael Nurse account, the Cyrilla Nurse account was opened on July 12, 2005. (Id.). The movant listed himself as an authorized user. (Id.). On July 12, 2005, the movant then went shopping at Home Depot in Deerfield Beach using the Cyrilla Nurse account, making two purchases totaling $1,224.95 and $500.00, using an account number ending in 5065. (Id.). The purchaser presented a driver's license ending in 2950. (Id.).

Fourth, bank records and store receipts showed that the movant "took over" the preexisting Home Depot account of Antoine Dolce and made substantial unauthorized purchases at several Home Depot stores. (Cr-DE#94:143-45). On June 16, 2005, Antoine Dolce went to his local Home Depot in North Miami, Florida and opened a credit

9

account. (Id.). The last four digits of the account number were
4433. (Id.). On the same day as he opened the account, Dolce made
a purchase for $385.56. (Id.). Dolce presented his driver's
license, ending in 3350, to establish his identity while making the
purchase. (Id.). Five days later, the movant added himself as an
authorized user to the Dolce account (id.). He then made purchases
with the account at Home Depot stores in Miramar, Pompano Beach,
and Hollywood, Florida. (Id.). Again on June 21,2005, he made a
purchase at the Miramar store for $2,242.37. (Id.). He then went to
the Hollywood store and bought merchandise costing $2,953.71.
(Id.). The next day, the movant went to the Pompano Beach store and
purchased merchandise totaling $2,420.23, and a $150.00 gift card.
(Id.). All of these transactions were made on the Dolce account
ending in 4433 and the movant presented his driver's license number
ending in 2950. (Id.).

   Fifth, bank records and receipts showed that the movant opened
and used a Sears account in the name of Allison Zorman. (Cr-
DE#94:146-50). The account was opened on June 24, 2005, and the
movant added himself as an "authorized user" that same day. (Id.).
The last four digits of the Zorman account were 3700. (Id.). On
August 16, 2005, the movant made several purchases totaling
$1,430.95, $150.00, and $125.05 at Sears in Pembroke Pines using
the Zorman account. (Id.). The salesperson entered the purchaser's
name into the computer system as "Dwight E. Moss, Jr."

   The final set of bank records and receipts showed that the
movant "took over" the pre-existing Home Depot account of William
Scarola. (Cr-DE#94:150-52). Scarola opened his account on August 2,
2003. (Id.). The last four digits of his account were 6030. (Id.).
On March 21, 2006, the movant added himself as an authorized user
on the Scarola account and went shopping at the Home Depot in

10

Sunrise, Florida. (Id.). The movant purchased items totaling $1,800.29, two $300.00 gift cards, and then more items costing $4,480.59. (Id.). Again, the movant presented his driver's license number ending in 2950. (Id.). In total, Citibank records identified more than fifty victims as having the movant's name or address associated with their credit accounts. (Cr-DE#95:333-34).

The government also offered evidence proving that the movant was not authorized to open or use these credit accounts or the identities of the listed account holders. Lewis Beauperthuy testified that he did not know the movant and did not authorize him as a user on any of his credit accounts. (Cr-DE#95:260-66). Beauperthuy did not apply for and did not make purchases with a Home Depot credit card. (Id.). Michael Nurse, a 72 year-old retired repairman on a fixed social security income, testified that he did not use credit cards or the internet and has never opened a Home Depot credit account. (Cr-DE#95:253-58). Nurse did not know the movant and never gave anyone, including the movant, permission to use his personal information. (Id.). Antoine Dolce, a registered nurse, applied for a Home Depot credit card at the North Miami Beach store, but did not designate any authorized users. (Cr-DE#95:268-73). He also did not know the movant, did not authorize him to make transactions using his account, and did not authorize the movant to use his personal information to access his account. (Cr-DE#95:273-76). Additionally, William Scarola, an employee of the Miami Police Department since 1981, has held a Home Depot credit account for several years. (Cr-DE#95:277-80). He also did not know the movant and did not authorize him as a user on his card. (Id.). Lastly, Allison Zorman submitted an affidavit attesting to the fact that she did not apply for a Sears credit card and did not authorize any person to use her account. (Cr-DE#94:145-48).

11

Special Agent Redding further confirmed that the victims did not authorize the movant to use their personal information or their credit accounts. He interviewed many of the people whose personal information was found in the movant's home, including Cecilia Franco, Olga Hyde, Jackie F. Benjamin, Marie Piccard, Olive Syder, John Ballestero, and Onofrio Raimondi. (Cr-DE#95:318-33). None of these individuals knew the movant or authorized him to use their personal information or their credit accounts. (<u>Id</u>.).

The government also presented video evidence of the movant making purchases on two of the fraudulent accounts. The first store surveillance video depicted the movant at the Deerfield Beach Home Depot making purchases on Cyrilla Nurse's account on July 12, 2006. Thelma Diggs, a sales associate at the Deerfield Beach Home Depot, confirmed that the movant was the person who made the purchases. (Cr-DE#95:286-94). She testified that the movant came into the store and attempted to make a large purchase as an authorized user on an account in the name of "Shiquella or something" Nurse. (<u>Id</u>.). At first, the movant did not have the right social security number for the account holder, so the transaction could not be completed. (<u>Id</u>.). When the movant finally gave Diggs the correct number, Diggs called the credit card company and was informed that the movant was listed as an authorized user. (<u>Id</u>.). Diggs then asked for the movant's driver's license, verified that he was the person pictured on the license and entered his driver's license number, ending in 2950, into the computer. (<u>Id</u>.).

The second surveillance video depicted the movant purchasing items at the Pembroke Pines Sears store on August 16, 2005 using the Zorman account. After discussing home theater products with the sales associate, Ivan Rojas, and viewing a demonstration video, the movant purchased a computer and home theater system. (Cr-

DE#95:297-310). Rojas described the movant's demeanor as friendly, very patient and not in a hurry. (Cr-DE#95:310).

The government also proffered eyewitness testimony regarding the purchases the movant made on March 21, 2006 using the Scarola account. Special Agent William Lowe ("Agent Lowe") and Home Depot Investigator John Rode ("Investigator Rode") were among the law enforcement officers who had planned to execute the search warrant at the movant's home when they received a telephone call that the movant was attempting to purchase goods at a Home Depot in Coral Springs, Florida. (Cr-DE#94:179-80). Agent Lowe and Investigator Rode went to the Coral Springs Home Depot. (Id.). There, they observed the movant exiting the store and getting into a Yellow Penske truck. (Id.). They followed the movant as he drove to the Home Depot store in Sunrise, Florida. (Id.). They observed they movant exit his truck and enter the store. (Cr-DE#94:181). Investigator Rode followed the movant inside and saw him approach the customer service desk. (Cr-DE#94:159). The movant placed a large order for construction materials, including windows, doors, and generators. (Cr-DE#94:159, 183). It took several Home Depot associates and a forklift to retrieve all of the merchandise the movant requested. (Cr-DE#94:167-69). After shopping for approximately two hours, the movant drove his truck to the front of the store for pick up. (Cr-DE#94:169, 181). The merchandise was brought out on four or five large flat carts. (Id.). Several Home Depot associates were needed to load it onto the movant's Penske truck. (Id.). The jury was also shown surveillance photographs taken by the agents. One of the photographs showed the movant on the phone while his truck was being loaded at the Home Depot store. (Id.).

At trial, the movant called his then ten-year-old son, Devont

13

Moss as a defense witness. Devont Moss testified that his "Uncle Wally" came to visit the movant's home and was "looking for something." (Cr-DE#95:352-54). Devont testified that "Uncle Wally" slid something under the couch while he was watching television. (Id.). Devont claimed that, the next day, when he was looking for his shoes, he found a gun wrapped in a paper towel under the couch. (Id.). Devont testified that he gave the gun to his stepmother, who called his father. (Id.). Devont said his father came home and Devont saw him "put the gun up.". (Id.).

After Devont Moss testified, the district court made the following statement outside the presence of the jury:

> THE COURT: Well, you know, there you go, because you know a child wouldn't understand that transitory possession is not a defense. And, so, in the effort of the child to help his father, the child said something which actually incriminated him.
>
> So, I want to congratulate whoever it is who came up with this brilliant idea to put this child on the stand. Yes. Do you want to say something, Ms. Mesnekoff?
>
> DEF. ATTY: Just to let the Court know that it's something that I personally agonized over. I do apologize to the Court.
>
> THE COURT: There's nothing to apologize for, I don't think. I mean, I assume you exercised, as best you could, your independent professional judgment. But, you know, I'm not going to forget this when it comes to sentencing if Mr. Moss is convicted.
>
> You know, I want you to know, I've been here 15 years and I was a state court judge for five years before I came here. So I've been on the bench about 20 years now, and I don't think I've seen a child - first of all, I know I haven't seen a child testify here in 15 years. And even in state court, I think that probably the only time I heard children testify were in child abuse cases when it was absolutely necessary that the child testify.
>
> So, it is very unusual, very very unusual to bring a ten-year old child in to testify in a criminal case, and it's certainly something that's going to stick in my mind.

14

(DE 95:354-55).

## Evidentiary Hearing Claim

The movant raises multiple claims of ineffective assistance of counsel in this §2255 proceeding. After review of the record, it became apparent that an evidentiary hearing was necessary with at least with regard to claim 1 above, that counsel was ineffective for misadvising him regarding pleading guilty to the indictment or negotiating and/or otherwise accepting the government's plea offer, rather than proceeding to trial.

In essence, the movant asserts that trial counsel's erroneous advice precluded him from making a knowing and intelligent decision whether to accept the government's plea offer or proceed to trial. (Cv-DE#1:6; Cv-DE#2:5; Cv-DE#21; Cv-DE#40). The claim was not conclusively refuted by the record, and warranted further evidentiary findings. At the evidentiary hearings, testimony was taken from the movant, and his criminal defense counsel, Faith Mesnekoff, Esquire.

The Sixth Amendment right to counsel includes the right to competent advice regarding the choice to accept a plea bargain or go to trial. Turner v. Tennessee, 664 F.Supp. 1113, 1120 (M.D. Tenn.), aff'd, 858 F.2d 1201 (6 Cir. 1988), vacated on other grounds, 492 U.S. 902 (1989), reinstated, 726 F.Supp. 1113 (M.D. Tenn. 1989), aff'd, 940 F.2d 1000 (1991), cert.denied, 502 U.S. 1050 (1992); accord, Johnson v. Duckworth, 793 F.2d 898, 900-02 (7 Cir.), cert.denied, 479 U.S. 937 (1986)(criminal defendant has right to effective assistance of counsel in deciding whether to accept or reject proposed plea agreement); United State ex rel. Caruso v. Zelinsky, 689 F.2d 435, 438 (3 Cir. 1982)(decision to

15

reject plea agreement is critical stage at which right to effective assistance attaches); <u>Beckham v. Wainwright</u>, 639 F.2d 262, 267 (5 Cir. 1991)(incompetent advice to withdraw negotiated plea and proceed to trial violated defendant's Sixth Amendment right).

A lawyer is obligated to keep the client informed of important developments, including any plea agreement offered by the government. Counsel's failure to do so is ineffective assistance. <u>Diaz v. United States</u>, 930 F.2d 832, 834 (11 Cir. 1991), <u>citing</u>, <u>Johnson v. Duckworth</u>, <u>supra</u>; <u>see</u> <u>also</u>, <u>Pham v. United States</u>, 317 F.3d 178, 182-83 (2d Cir. 2003)(defense counsel's failure to inform defendant of government's "global plea offer" constituted ineffective assistance); <u>Jones v. Wood</u>, 114 F.3d 1002, 1012 (9th Cir. 1997)(failure to inform client of plea bargain may have risen to the level of ineffective assistance of counsel if petitioner had shown prejudice); <u>United States v. Rodriquez</u>, 929 F.2d 747, 752 (1st Cir. 1991)("Ordinarily, counsel's failure to inform client of plea agreement constitutes ineffective assistance of counsel."); <u>United States v. Zelinsky</u>, 689 F.2d 435, 438 (3rd Cir. 1982)("It would seem that, in the ordinary case, a failure of counsel to advise his client of a plea bargain would constitute a gross deviation from accepted professional standards.").

In reviewing ineffective assistance of counsel with respect to guilty pleas, the United States Supreme Court has applied the "objective standard of reasonableness" by considering whether counsel's representation was "within the range of competence demanded of attorneys in criminal cases." <u>Hill v. Lockhart</u>, 474 U.S. 52, 56-57 (1985)(applying <u>Strickland</u> requirements to review for ineffective assistance of counsel with respect to guilty pleas (citations omitted)). With regard to the prejudice prong, the Court held that the inquiry focused on "whether counsel's

16

constitutionally ineffective performance affected the outcome of the plea process." <u>Hill</u>, 474 U.S. at 59. If it is found that counsel failed to inform his client of the government's plea offer, the remedy is for the District Court to ensure that the government reinstates its original plea offer. <u>United States v. Baylock</u>, 29 F.3d 1458, 1468 (9 Cir. 1994).

However, as with other claims of ineffective assistance, a defendant who claims that counsel performed ineffectively in connection with a decision to reject a plea offer must demonstrate that he suffered prejudice to prevail. <u>Turner v. Tennessee</u>, 664 F.Supp. 1113 (M.D. Tenn.), <u>aff'd</u>, 858 F.2d 1201 (6 Cir. 1988), <u>vacated on other grounds</u>, 492 U.S. 902 (1989), <u>reinstated</u>, 726 F.Supp. 1113 (M.D. Tenn. 1989), <u>aff'd</u>, 940 F.2d 1000 (1991), <u>cert.denied</u>, 502 U.S. 1050 (1992); <u>accord</u>, <u>Johnson v. Duckworth</u>, 793 F.2d 898, 900-02 (7 Cir.), <u>cert.denied</u>, 479 U.S. 937 (1986)(criminal defendant has right to effective assistance of counsel in deciding whether to accept or reject proposed plea agreement); <u>United State ex rel. Caruso v. Zelinsky</u>, 689 F.2d 435, 438 (3 Cir. 1982)(decision to reject plea agreement is critical stage at which right to effective assistance attaches); <u>Beckham v. Wainwright</u>, 639 F.2d 262, 267 (5 Cir. 1991)(incompetent advice to withdraw negotiated plea and proceed to trial violated defendant's Sixth Amendment right).

In other words, a petitioner seeking to establish prejudice must prove that there was reasonable probability that absent counsel's error he would have accepted the offer. <u>Diaz v. United States</u>, 930 F.2d 832, 835 (11 Cir. 1991), <u>citing</u>, <u>Johnson v. Duckworth</u>, <u>supra</u>; <u>Jones v. Wood</u>, 114 F.3d 1002 (9 Cir. 1997), and cases cited at 1012. If it is found that counsel failed to inform his client of the government's plea offer, the remedy is for the

District Court to ensure that the government reinstates its original plea offer. <u>United States v. Baylock</u>, 29 F.3d 1458, 1468 (9 Cir. 1994).

A. <u>Misadvice Regarding Pleading Guilty</u>

The movant claims counsel was ineffective for misadvising him regarding the benefits of pleading guilty versus proceeding to trial. The claim was not refuted by the record and an evidentiary hearing was had, at which time the movant's trial counsel, Faith Mesnekoff, Esquire, and the movant testified.

Attorney Mesnekoff, a seasoned criminal defense attorney, who represented the movant while she was employed as an Assistant Federal Public Defender, testified that she met with the movant on multiple occasions to discuss the government's voluminous discovery evidence, had two full-time investigators working with her on the case, and vigorously challenged the strength of the government's case pretrial by filing a suppression motion, and at trial by conducting a thorough cross-examination of the government witnesses.

During her discussions with the movant, counsel emphasized the strength of the government's case, and presented the movant with various guideline ranges to demonstrate his exposure if he pled guilty versus if he proceeded to trial. Counsel further stressed that there was overwhelming evidence implicating the movant in the offenses, including videotapes and photographs. Counsel then cautioned the movant that based on this evidence, it would be very difficult to obtain an acquittal at trial. Moreover, as early on as October 9, 2006, counsel sent the movant a letter memorializing the various guideline range scenarios, as well as, his sentence

exposure if he pled guilty. In part pertinent, this letter
cautioned the movant as follows:

> If you were to testify at trial, and the judge
> and the government could prove that you were
> lying in your testimony, the government could
> prosecute you for perjury in a separate case
> and/or increase the offense level by 2 for
> obstruction of justice. Thus, the offense
> level would be 26. the Guideline range would
> then be **78-97 months, plus the 2-year
> consecutive sentences**.

> If you plead guilty, you should get a 3-level
> reduction from level 24, reducing the offense
> level to 21. This results in a Guideline range
> of 46-57 months. With the 2-year consecutive
> sentence, the total sentencing range would be
> 70-81 months.

(DE#33:Ex.1)(emphasis added).

Counsel further relayed to the movant the substance of
various, on-going conversations with the government regarding
negotiating a plea which included cooperation. Attorney Mesnekoff
was forthright that at all times, the movant was never interested
in pleading guilty nor cooperating with the government, and was
adamant about going to trial.

On November 6, 2006, attorney Mesnekoff recalled receiving a
facsimile transmission from the government, which was entered into
evidence at the evidentiary hearing, wherein the government
attached a proposed plea agreement for the movant's consideration.[8]
Counsel was unequivocal that she mailed a copy of the proposed plea
to the movant and then met with him, at which time she went over

---

[8]Both the facsimile and the proposed plea were entered into evidence.

19

the specific terms of the written plea, which required in part that the movant plead guilty to counts 1,2, 3, and 6, in exchange for the government dismissing counts 4 and 5, which were the aggravated identity theft offenses that, at the judge's discretion, could have resulted in consecutive sentences. During this discussion, counsel advised the movant of the guideline range he faced and the estimate if he went to trial.

Counsel's notes of this meeting reflect that she advised the movant if he pled guilty he was facing 78 to 97 months in prison, but if he rejected the plea there could be an upward departure and three consecutive sentences for the §1028A violations. Counsel stressed that the benefit of pleading guilty would insure that the government not seek consecutive sentences as to the other §1028A violations. Counsel recalled that regardless of this advice, the movant was still not interested in pleading guilty and wanted to proceed to trial. According to counsel, the movant would only consider pleading guilty, if he could be guaranteed a sentence of 10 years probation. Counsel advised the movant, however, that this expectation was absurd and unrealistic.

After reviewing her files more closely, counsel found additional notes taken on January 4, 2007, just four days prior to trial, after a court status conference. These notes reflect discussions had with the movant regarding trial preparation, as well as, the issue of entering into a plea agreement with cooperation. Although counsel realized her initial estimate to the movant of 63 to 78 months in prison if he pleaded guilty was inaccurate, she testified that it is her practice to advise clients that this computation is merely an estimate, and may not be accurate. She could not recall whether she advised the movant that her initial estimate was inaccurate because the movant's criminal

20

history category was not III, but rather VI. The correct guideline range exposure was 150 to 188 months in prison. However, she did not believe that during plea negotiations the estimation was incorrect as the exact criminal history had not been determined. Counsel, however, was steadfast that the movant at all times was adamant about proceeding to trial unless he could obtain a plea which would insure a probationary sentence only.

The movant, however, offered equivocal and contradictory testimony. At first, the movant denied ever being advised what his exposure would be if he proceeded to trial. Although the movant acknowledged receipt of counsel's October 2006 letter discussing his sentence exposure, and being aware that if convicted at trial, he faced consecutive sentences, he denies being told the exact exposure in years. However, he then testified that he was aware he faced about fourteen years if he went to trial and were convicted, but claims counsel never discussed this with him.

The movant also testified he was willing to plead guilty, but not to specific offense characteristics for which he was not accountable. In other words, he refused to be held accountable for offenses involving G.E. Bank as he claimed he was only charged with offenses arising from Citibank. The movant claims that his relationship with counsel was strained because counsel would refuse to do as he instructed. According to the movant, he asked counsel to attempt to get a more favorable plea, including one that involved cooperation as he had information for the government. At the conclusion of a November 2006 meeting, the movant denied ever seeing counsel again until trial commenced in January 2007. The movant testified that had he known he faced 222 months in prison if convicted at trial, he would have taken the government's plea offer.

At the second evidentiary hearing, however, the movant contradicted himself, stating that the last time he had any discussions with counsel regarding pleading guilty was in October 2006, and had no further discussions with her until trial started. However, during cross-examination, when shown his testimony during the first evidentiary hearing, the movant attempted to explain this contradiction, stating that he may have spoken in error, getting the dates mixed up. The movant again contradicted his prior testimony when he stated unequivocally that he was only interested in serving ten years probation, and never waivered from wanting that kind of plea. The movant's testimony throughout these proceedings is fraught with contradictions, is irreconcilable and thus rejected.

Having carefully attended to the testimony of the witnesses at the evidentiary hearing and considered the entire record in this case, the undersigned credits counsel's testimony that the she fully advised the movant about the benefits of pleading guilty versus proceeding to trial. Moreover, this court credits counsel's testimony that the government's proposed plea offers were conveyed to the movant who adamantly rejected any plea which required prison time, and that the movant would only consider a plea that would guarantee him probation. The court further finds counsel's testimony more credible and believes that the movant insisted on proceeding to trial and now, in hindsight, regrets his decision. The court rejects as disingenuous the movant's testimony that he was never advised of his sentence exposure or of the government's plea offer. Thus, the movant has failed to make a showing in this collateral proceeding that he wished to enter a guilty plea, nor that he was misadvised or prevented from doing so. Thus, the movant has failed to establish deficient performance or prejudice pursuant to <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

Here, the movant has failed to establish a *prima facie* case as to <u>Strickland's</u> first prong, that counsel's performance was constitutionally deficient. The evidence showed that the movant was properly counseled, more than adequately under Sixth Amendment standards, regarding the terms of the pleas and the risks associated with proceeding to trial. In short, the movant has not carried his burden of showing that counsel's performance was deficient. <u>Brady</u>, 397 U.S. at 756.

Even if we were to assume, without deciding, that counsel was deficient in this regard, the movant would also have to establish that he was prejudiced by counsel's misadvice. A significant sentencing disparity in combination with defendant's statement of his intention to accept a plea is sufficient to support a prejudice finding regarding a misadvice of plea by counsel. <u>See</u> <u>Pham v. United States</u>, 317 F.3d 178, 182 (2nd Cir. 2003)(<u>citing</u> <u>United States v. Gordon</u>, 156 F.3d 376, 380 (2nd Cir. 1998).

This court finds that the movant refused to accept any term of imprisonment, and by the movant's own admission, would only agree to a plea involving a maximum of ten years probation. In fact, even when counsel erroneously advised the movant in writing that his exposure with a plea was only approximately 60 months, the movant still refused to accept anything other than probation.

## B. <u>No Contest/Alford Plea</u>

The movant also appears to argue that counsel never advised him that he could plead straight up to the court. In other words, he appears to fault counsel for failing to properly advise him that

he could enter a no contest or an <u>Alford</u> plea.[9] The movant
acknowledged at the evidentiary hearing that he had discussions
with counsel regarding pleading guilty, but states he was unaware
he could plead to the indictment. However, as ultimately conceded
by the movant at the evidentiary hearing, he would only agree plea
to plead to probation, and not to any offense which would result in
a term of imprisonment. As previously narrated in this Report, the
undersigned finds the movant's testimony fraught with
inconsistencies, and therefore, the undersigned finds his
allegation that he would have pled straight up to the indictment to
be highly suspect and disingenous, and this is hereby rejected.

As will be recalled, the movant testified that he proceeded to
trial because counsel never informed him of his exact sentence
exposure. However, Attorney Mesneskoff was forthright in her
testimony, which was also corroborated by letters to the movant and
notes to the file, that she advised the movant on numerous
occasions that given the strength of the government's evidence, the
movant's exposure would be minimized if he pled guilty and/or
accepted the terms of the government's plea offer. Moreover,
counsel was vehement that the movant insisted on proceeding to
trial.

It is well-settled that a defendant has no absolute right
under the United States Constitution or under <u>Fed.R.Cr.P.</u> 11 to
have his guilty plea accepted by the court. <u>Santobello v. New York</u>,
404 U.S. 257, 262 (1971); <u>North Carolina v. Alford</u>, 400 U.S. 25, 38
n. 11 (1970). When a defendant attempts to couple a guilty plea
with an assertion of facts that would negate his guilt, a judge may

---

[9]A guilty plea accompanied by an assertion of innocence. <u>See</u> <u>North Carolina</u>
<u>v. Alford</u>, 400 U.S. 25, 37 (1970).

properly treat this assertion as a protestation of innocence. United States v. Gomez-Gomez, 822 F.2d 1008, 1011 (11th Cir. 1987). Although the judge may enter judgment upon a guilty plea, he is not required to do so. Gomez, supra, citing, North Carolina v. Alford, 400 U.S. 25, 38 n. 10 (1970). In Gomez, the Eleventh Circuit concluded that when a defendant casts doubts upon the validity of his guilty plea by protesting his innocence or by making exculpatory statements, the court may resolve such doubts against acceptance of the plea.

In this collateral proceeding, the movant has failed to establish that even if he had been advised that he could enter a no contest or Alford plea while maintaining his innocence, that such a plea would have been accepted by the court. Arguably the government may have objected to such a plea being accepted by the court. Thus, no prejudice has been established arising from counsel's failure to advise the movant that he could enter an Alford or no contest plea.

Moreover, this court credits counsel's testimony that the movant would not have changed his plea and, in fact, was insistent on proceeding to trial. The court is not persuaded and therefore rejects the movant's testimony that he would not have proceeded to trial and would have pleaded guilty. Under these circumstances, the movant is entitled to no relief on this claim.

Finally, the court finds that the movant knew the benefits of pleading guilty and understood that if he proceeded to trial and was convicted, he faced a severe term of imprisonment. The court is not persuaded and finds disingenuous the movant's testimony that had he been properly advised regarding his sentence exposure, he would have pleaded guilty and not proceeded to trial. The movant

has failed to make a showing in this collateral proceeding that he was misadvised or prevented from pleading guilty as charged. Thus, the movant has failed to establish deficient performance or prejudice pursuant to <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). He is therefore entitled to no relief on this claim.

<u>Remaining Claims</u>

In **claim two**, the movant asserts that he was denied effective assistance of counsel, where his lawyer failed to challenge on appeal the trial court's denial of the justification and/or innocent possession instruction. (Cv-DE#10:9-15,65; Cv-DE#9:33,39; Cv-DE#40).

The Eleventh Circuit has repeatedly declined to entertain the justification and/or innocent possession instruction in relation to §922 offenses. <u>See</u> <u>cf</u>., <u>United States v. Palma</u>, 511 F.3d 1311, 1316, n.3 (11th Cir. 2008); <u>United States v. Beverly</u>, 194 Fed.Appx. 624, 628 (11th Cir. 2006)(unpublished) (holding that a district court did not abuse its discretion in refusing to give a "mere inspection" instruction in a firearm possession case). In so noting, the Eleventh Circuit has cautioned that the defense would be extremely limited, only applicable under "extraordinary circumstances." <u>See</u> <u>Deleveaux</u>, 205 F.3d 1292, 1297 (11th Cir. 2000)(agreeing with other circuits that such a defense may be available but only in extremely limited circumstances). In <u>Deleveaux</u>, the court ruled that a justification defense instruction would be warranted under extraordinary circumstances where:

> (1) the defendant was under unlawful and present, imminent, and impending threat of death or serious bodily injury; (2) the defendant did not negligently or recklessly

26

> place himself in a situation where he would be
> forced to engage in criminal conduct; (3) the
> defendant had no reasonable legal alternative
> to violating the law; and (4) there was a
> direct causal relationship between the
> criminal action and the avoidance of the
> threatened harm.

United States v. Deleveaux, 205 F.3d at 1297. No such showing has been made here. To the contrary, there is nothing of record to suggest that the movant was under imminent and impending threat of death nor that he had any reasonable legal alternative.

Moreover, other circuits to have considered the theory of "temporary innocent possession," have also declined to recognize it, and some have, in fact, expressly rejected the defense. See United States v. Johnson, 459 F.3d 990, 997-98 (9th Cir. 2006) (holding that such a defense would undermine the statutory design of §922(g)); United States v. Teemer, 394 F.3d 59, 62-65 (1st Cir. 2005)(rejecting innocent possession defense and affirming district court's refusal to give jury an instruction on "fleeting" or "transitory" possession); United States v. Mercado, 412 F.3d 243, 250-52 (1st Cir. 2005)(rejecting innocent possession defense and holding that even momentary or fleeting possession of a firearm is sufficient under the statute); United States v. Gilbert, 430 F.3d 215, 218 (4th Cir. 2005)(rejecting the proposal of an exception to §922(g)(1) when the defendant had no illicit motive and attempted to quickly rid himself of the firearm). Other courts have also rejected substantially similar defenses. See United States v. Hendricks, 319 F.3d 993, 1004-05 (7th Cir. 2003)(holding that only justification defenses would be recognized); United States v. Adkins, 196 F.3d 1112, 1115 (10th Cir. 1999)(holding that trial court acted properly in refusing to give jury instruction on "fleeting possession" theory). However, the District of Columbia

27

Circuit is the only court that has held otherwise. See <u>United States v. Mason</u>, 233 F.3d 619, 624-25 (D.C. Cir. 2000)(defining and applying the transitory innocent possession defense). That court very narrowly defines the limits of the defense to situations where the firearm was obtained by innocent means and for no illicit purpose and where the possession was transitory in light of the circumstances. <u>Id</u>. at 624.

In this case, the movant claims he was entitled to the instruction because his son found the firearm, told his stepmother, who in turn put the gun away. (Cv-DE#10:8). However, contrary to the representation made herein, at trial the movant's son testified that it was the movant who, in fact, put the firearm away. (DE#34:Ex.C:Trial Trans.:350-54). Consequently, even if counsel had raised the issue on appeal, no showing has been made that the outcome of the proceeding would have been different. Thus, under the totality of the circumstances present here, no deficient performance or prejudice has been established arising from appellate counsel's failure to pursue this nonmeritorious claim on appeal. See <u>Matire v. Wainwright</u>, 811 F.2d 1430, 1435 (11 Cir. 1987).

In **claim three**, the movant asserts that he was denied effective assistance of counsel, where his lawyer failed argue at the suppression proceeding that: (1) the movant was seized in violation of <u>Miranda</u>,[10] (2) the consent was not knowing and voluntary because it was based on an unlawful detention; and, (3) the search and seizure was effectuated by Florida state police officers, who exercised power beyond their jurisdiction. (Cv-DE#9; Cv-DE#10:68; Cv-DE#21).

---

[10]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

First, the movant challenged the court's denial of his suppression motion on appeal, where the appellate court summarily affirmed the trial court's findings. See United States v. Moss, supra. The movant has, therefore, not demonstrated a change in circumstance, sufficient to warrant relitigation of the claim. The presentation of the claim in this §2255 proceeding in the guise of an ineffective assistance of counsel claims adds nothing of substance which would justify a different result. See Hobson v. United States, 825 F.2d 364, 366 (11th Cir. 1987)(claim raised and considered on direct appeal precludes further review of the claim in a §2255 motion), vacated on other grounds, 492 U.S. 913 (1989); United States v. Nyhuis, 211 F.3d 1340, 1343 (11th Cir. 2000); Webb v. United States, 510 F.2d 1097 (5th Cir. 1975); Belford v. United States, 975 F.2d 310, 313 (7th Cir. 1992), overruled on other grounds by Castellanos v. United States, 26 F.3d 717 (7 Cir. 1994); Graziano v. United States, 83 F.3d 587 (2d Cir. 1996)(Collateral attack on a final judgment in a criminal case is generally available under §2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in complete miscarriage of justice.). No such showing has been made here.

Moreover, even if counsel had further pursued the arguments raised by the petitioner here in support of the suppression motion, there is nothing of record to suggest that the trial court would have granted the suppression motion. Consequently, the movant cannot satisfy the prejudice prong of Strickland. It is evident that counsel lodged a vigorous attack, cross examined witnesses at the suppression proceeding, and made arguments to the court. In fact, the evidence adduced therein confirms that the denial of the motion was proper and no error occurred. Consequently, counsel was

29

not ineffective nor was the movant prejudiced by counsel's failure to pursue the arguments challenged herein.

Specifically, review of the record reveals that two law enforcement officers testified as government witnesses, to-wit, Sgt. Ray Raimondi and Detective Charles Ed Laughlin, regarding the movant's encounter with police on February 28 and his subsequent statement. According to the facts developed at the hearing, Pembroke Pines Police Sgt. Raimondi learned that a new user had been added to his Sam's Club credit account and was making purchases on the account.(Cr-DE#92:5). He reported the matter to Pembroke Pines Police Detective Laughlin, a member of the U.S. Secret Service South Florida Joint Fraud Task Force. (Id.:8,10,40-41).

Thereafter, Sam's Club provided Sgt. Raimondi with copies of the application completed by the movant,[11] and his picture which was taken to create the membership card. (Id.:6). Sgt. Raimondi ran the driver's license number through a database and obtained the movant's photograph, which matched the photograph on the Sam's Club membership card. (Id.).

After running a criminal history check which showed the movant had been previously convicted of a felony, and listed an address in Pembroke Pines, Sgt. Raimondi drove to that address in an unmarked vehicle, at which time he observed the movant assembling a new go-cart in his front yard. (Id.). Sgt. Raimondi then contacted Sam's Club and confirmed that a go-cart had been purchased by the movant with the new membership. (Id.). Sgt. Raimondi notified Detective Laughlin, who in turn showed up at the movant's house as the movant

---

[11]The application also had the movant's driver's license number. (Id.).

was returning home from briefly going to a tire ship. (<u>Id</u>.:10-11).

At that time, the detective asked the movant for his driver's license, and advised him that he was conducting an investigation concerning fraudulent credit card transactions. (<u>Id</u>.:45-47). The movant was advised of and acknowledged understanding his <u>Miranda</u> rights. (<u>Id</u>.:12,53). During the ensuing conversation, the movant advised the officers that he met a Nigerian man at a park, who offered to help the movant acquire a go-cart if the movant would purchase a specific list of items, with a specific account, at a particular Sam's store. (<u>Id</u>.). According to the movant, the man let him keep the go-cart as long as he gave the individual the other purchased items. (<u>Id</u>.).

Thereafter, the movant was asked and he consented to allow the police to look inside his home in order to confirm whether the other items purchased at Sam's Club were located therein. (<u>Id</u>.:15,50). The movant further agreed to permit the police to search inside a utility trailer behind the home. (<u>Id</u>.:15,53-55). Inside the trailer, the police observed a large quantity of lawn mowers and power tools, some of which were still in unopened boxes, and others which appeared to be new. (<u>Id</u>.).

After the officers completed their search, the movant agreed to accompany them to the police statement to give a statement. (<u>Id</u>.:18-19,56). At the station, the movant confirmed that he had been advised of his constitutional rights, and that he willingly spoke with to the officer. (Cr-DE#21:Ex.1).

Meanwhile, on March 16, 2006, Special Agent Scott Redding with the Joint Fraud Task Force requested a search warrant, and submitted an affidavit in support thereof, describing the fraud on

Sgt. Raimondi's account, the search of the movant's home, and the movant's recorded statement. (Cr-DE#21:Ex.3). On March 21, 2006, the warrant was executed at the movant's residence. (Cr-DE#94:179,186-87).

During that search, officers seized numerous items revealing the widespread scope of the movant's credit card fraud and identity theft scheme. (Cr-DE#94:186-225). Specifically, they discovered credit cards, store membership cards, and account numbers which were not in the movant's name, including a Sears Mastercard issued to Jackie F. Benjamin, a Wachovia Visa card issued to Gretchen Muniga, a Sam's membership card issued to Cassandra Goodman, and two Sam's membership cards in the movant's name, each with a different membership number. (Cr-DE#94:191-99). They also discovered preapproved credit card applications addressed to Jackie Benjamin, Marie Piccard, Olive Syder, and John Ballestero. (Id.). Also seized was a notebook containing the names, addresses, social security numbers, driver's license numbers, dates of birth, and phone numbers for Terrance R. Sobrian, Onofrio Raimondi, Sylvia Pita, Lilian Aquilar, Richard Sobaran, Germin Coleman, Cheryl Wilson, Cecilia Franco, Olga Hyde, Paul A. Courd, Sonia E. Santiago, Farzaneh Hidalgo, Michelle LaVaul, Elsa M. Flores, Phyllis Vilbas, Ephise Jean, and Helen C. Cisnero. (Id.; Cr-DE#94:220-25). A .25 caliber pistol, a holster, two boxes of nine millimeter ammunition, a magazine for a nine millimeter firearm, a military style bullet-proof vest were also seized. (Id.:202). At the back of the movant's home there was also a utility trailer which contained recently purchased furniture, dressers, armoires, and 22 boxes of hardwood flooring purchased at Home Depo. (Cr-DE#94:205-10).

After the suppression proceeding, a Report was entered finding

32

that the movant's brief detention was supported by reasonable suspicion and that the movant had voluntarily consented to the brief search of his residence on February 28th. (Cr-DE#30). The court further found that the movant waived his Miranda rights prior to making the recorded statement. (Id.). Notwithstanding, the court noted that the reading of such rights was not required because the movant was not placed under arrest and had voluntarily traveled to the police station. (Id.). The Report recommended denial of the suppression motion, which was subsequently adopted by the district court. Thereafter, the appellate court summarily affirmed the trial court's rejection of the suppression motion. See United States v. Moss, 273 Fed.Appx. 840 (11th Cir. 2008).

Under the circumstances present here, the movant cannot demonstrate prejudice arising from counsel's failure to present the arguments raised by the movant here in support of the suppression motion. In other words, he cannot show that but for counsel's alleged deficient performance, the outcome of the proceeding would have been different as the court would have granted the movant's suppression motion. Thus, he has failed to satisfy Strickland's requirements and is entitled to no relief on this claim.

## Conclusion

It is therefore recommended that this motion to vacate be denied.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

Signed this 3rd day of March, 2010.

_____
UNITED STATES MAGISTRATE JUDGE

cc:  Nathan D. Clark, Esquire
     Attorney for Movant
     18330 Franjo Road
     Palmetto Bay, FL 33157

     Russell Koonin, AUSA
     U.S. Attorney's Office
     99 N.E. 4th Street
     Miami, FL 3313